**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-317 (1) (TSC)** |
| **v.** | : | |
| | : | |
| **BENJAMIN LAROCCA,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Benjamin Larocca to three months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

## I.      Introduction

Defendant Benjamin Larocca, a 28-year-old residential sales consultant from Texas, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1]      Although the Statement of Offense in this matter, filed on May 25, 2022, (ECF No. 55 ¶6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Benjamin Larocca pleaded guilty to one count of 18 U.S.C. § 1752(a)(2).  As explained herein, several aggravating factors weigh in favor of a sentence of incarceration.  Larocca and co-defendant Christian Cortez unlawfully entered the Capitol Building on January 6, 2021.  When they exited the building through the North Doors, a crowd attempting to enter or reenter the building surrounded the Doors.  Members of the Crowd tried to prevent police from closing the North Doors by throwing projectiles and using a bike rack barricade as a battering ram.  While Larocca was on the edge of that crowd, Larocca's co-defendant, Christian Cortez, led rioters in this attack on police.  Larocca did not appear to engage directly in the confrontation, but he was on the receiving end of fire-extinguisher retardant sprayed by police to disperse rioters from the Doors.  Larocca did not leave the area.  As Cortez screamed expletives at police trying to close the Doors, Larocca remained close by.  Videos and photos recorded by Larocca around the time of the North Doors attack and inside the Capitol show his extreme indifference to the chaos and violence around him.  Larocca posted videos and photos to his Instagram story and sent messages to other Instagram users boasting about his and Cortez's conduct at the Capitol.

The Court must also consider that Larocca's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  Larocca's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, the facts of and circumstances of Larocca's crime support a sentence of three months'

incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

## II.        Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Larocca's conduct and behavior on January 6.

*Benjamin Larocca's Role in the January 6, 2021, Attack on the Capitol*

Benjamin Larocca and his co-defendant, Christian Cortez, 21-cr-317 (2) (TSC),[2] drove a rental car from their home[3] in Seabrook, Texas, to Washington, D.C., to attend the former President's "Stop the Steal" rally.  On January 6, 2021, the defendants did not attend the rally because they decided that they did not want to wait to be admitted to the cordoned-off area at the White House Ellipse, where the rally was principally held and where the former President was giving a speech.  They were able to hear the speech over loudspeakers outside of the Ellipse, however.  As the crowd at and near the Ellipse began to march to the Capitol, Larocca and Cortez marched among them.

As Larocca and Cortez approached the Capitol, and later while they were inside the Capitol, they both recorded photos and videos on their cell phones, some of which they posted to

---

[2]        Cortez pleaded guilty to 18 U.S.C. § 231(a)(3) on May 25, 2022, and is scheduled to be sentenced by this Court on August 31, 2022.

[3]        On and after January 6, 2021, Larocca and Cortez were roommates.

the social media platform, Instagram, during and immediately after the riot.  When Larocca and Cortez arrived in the vicinity of the Capitol, rioters had successively breached the outer perimeter of the grounds, the Lower West Terrace, and the Upper West Terrace.  They saw other rioters climbing the walls of the building and bike rack barriers that previously had been blocking entry to Capitol grounds and the Lower West Terrace but had since been cast aside by rioters advancing into the restricted area of Capitol Grounds.  As can be seen and heard in Larocca and Cortez's photos and videos, the crowd surrounding the Capitol was raucous and numbered in the thousands.

 

*(Left) Screenshot from Exhibit 1, Larocca's Instagram Story, showing a rioter scaling the outer wall to the Upper West Terrace using a bike rack barricade as a ladder*

*(Right) Exhibit 2 – "Selfie" taken by Cortez showing rioters scaling the walls on the left side of the Capitol*

Between approximately 2:40 and 2:50 p.m.,[4] Larocca and Cortez made their way to the Upper West Terrace on the Senate side of the Capitol building via the Northwest Stairs. From there, Larocca and Cortez breached the Capitol building at approximately 2:53 p.m. through the Parliamentarian Door. Both Larocca and Cortez recorded their entry on their cell phones as they crossed the threshold of the Capitol building.



*Exhibit 3 – Larocca and Cortez's entry into the Capitol building at 2:53 p.m. as visible on CCTV; Larocca is highlighted by the larger red rectangle towards the bottom of the frame, Cortez is highlighted by the smaller red rectangle towards the top of the frame.*

Once inside the building, Larocca and Cortez proceeded to the Brumidi Corridors,[5] where they joined a crowd of rioters chanting and facing off with police who were trying to block the rioters' passage. Larocca recorded rioters (including himself) chanting "USA! USA!" and "Whose

---

[4]     This estimated time window is based on metadata from Larocca's and Cortez's photos and videos taken from their cell phones.

[5]     The Brumidi Corridors are ornate hallways on the first floor of the Capitol on the Senate side of the building. Police guarded the Corridors heavily throughout the riot due to their proximity to the Senate Chamber and members of Congress' evacuation routes.

house?  Our house!" and "Forward!"   Larocca posted these videos to his Instagram story,[6] Exhibit 1, which would have been visible to all of Larocca's Instagram followers.[7]  To one of the videos, Larocca added a caption that stated:  "We got in."



*Screenshot from Exhibit 1, Larocca's Instagram story, showing Larocca inside the Brumidi Corridors, facing U.S. Capitol Police, and including the caption, "We got in."*

---

[6]     An Instagram "story" shows one or more photos or videos in 15-second clips.  The clips remain in the user's story and are visible to the user's "followers" for 24 hours.  If the user's Instagram is "public," anyone can view the user's story, not just their followers.  Instagram users frequently, but not universally, post such photos and videos to their story contemporaneous to the events that the photos or videos depict.

[7]     The government was not able to determine how many Instagram followers Larocca had on January 6, 2021, or how many Instagram users saw his story that day.

Capitol Police began directing rioters in the Brumidi Corridors to exit the building through the North Doors.  Larocca and Cortez exited through the North Doors at approximately 3:06 p.m. In their 13 minutes inside the Capitol Building, Larocca and Cortez did not cover a lot of ground— the distance from the Parliamentarian Door to the North Doors is relatively short, as shown below in Exhibit 4.  However, any progress they intended to make through the building's interior was hampered by the heavy police presence in the Brumidi Corridors.



*Exhibit 4 – Map of the First Floor of the Capitol Building; Arrows show Larocca and Cortez's approximate path from the West Lawn, up the Northwest Stairs, to the Parliamentarian Door (marked "P") through the Brumidi Corridors, and out the North Doors (marked "N")*

Once outside, Larocca and Cortez did not vacate the restricted area of the Capitol Grounds. Instead, they again joined with a crowd agitating against the police outside the North Doors.  At this point, police were trying to close the North Doors and prevent additional rioters from entering the Capitol.  A continuous, high-pitched alarm blared and smoke from crowd-suppression

ordinance[8] emanated from the Doors, but rioters, including Larocca and Cortez, were not deterred.

Rioters threw projectiles at the police and thrust a metal bike rack barricade through the Doors like

a battering ram.  (*See* Ex. 5)  In the midst of the assault on the Doors, Capitol Police officers tried

to negotiate with rioters, asking them to stay back while the crowd chanted, "Let us in! Let us in!"

(*See* Ex. 5)

Larocca recorded the rioters clambering to get back in the North Doors on his cell phone

from a distance.  Cortez was at the front of this crowd.



*Screenshots from videos, from left:*
*(a) from Exhibit 6, video recorded by Larocca on his cell phone showing his position relative to the North Doors,*
*(b) from Exhibit 5, appx. at marker 2:50, showing Cortez (circled in red) standing at the edge of the crowd, near the Doors and very close to police, and*
*(c) from Exhibit 5, appx. at marker 5:00, showing Cortez screaming at officers as they try to close the Doors.*

---

[8]      Likely tear gas or fire-extinguisher retardant.  Police, who were spraying from inside the North Door vestibule, are not visible in these videos.

After about 5 minutes of back and forth between rioters and police, as shown in Exhibit 5, the police deployed OC spray and brandished fire extinguishers.  At this moment, Cortez stepped in front of the Doors and began screaming at police:  "Fuck you!" and "Oath breakers!"  Cortez had been holding a large blue colored flag on a pole, which he slammed onto the ground as he confronted the police.  Officers turned their attention to Cortez and sprayed him with OC.  Rather than back down, Cortez continued to scream:  "Do it some fucking more! Do it some fucking more!"  Larocca witnessed this confrontation but did not participate in it.

Later that day, Cortez posted a "selfie" to Instagram taken within 500 feet of the North Doors.  Cortez was red and bleary-eyed, and angled the camera to show police officers near him in the background.



*Exhibit 7 - Cortez's "selfie" posted to Instagram*

Cortez posted a caption with the image that read: "Just hanging with the besties." Larocca posted a comment: "Hahaha." In response to another commenter, Cortez posted a comment: "we were not the violent ones, but definitely got fucked up … I will fight for your freedom until I die. I swear it."

On January 6 and 7, Larocca sent private messages to other individuals via Instagram Messenger. These messages—each between Larocca and a different Instagram user—read:

- Larocca: "Haha dude me and Christian got 4 different kinds of mase sprayed on us … tear gassed etc."

- Instagram User 1: "You wild!! Love it!" Larocca: "Haha hell yeah bro! We kind of got fucked up … Lmaooo."

- Instagram User 2: "Damn you're brave." Larocca: "Hell yea. It was a demonstration of how we can take it back. Antifa was disguised as trump supporters and started a lot of shit."

- Instagram User 3: "Bro you Fucking stormed the United States Capital today." Larocca: "Allegedly ;)."

*Larocca's FBI Interview*

Larocca voluntarily agreed to be interviewed by the FBI prior to his arrest. He was generally forthcoming about his conduct. He reported that he and Cortez traveled together to Washington, D.C. and remained together throughout the day on January 6. Larocca said that, while inside the Capitol building, he and Cortez were in the "tour area," though he acknowledged that they were not on a tour and did not sign up for a tour. He characterized himself as just "chilling" in the Brumidi Corridors and shouting "our house." Larocca stated that they left the building after being told by police that they would be arrested if they did not leave. Larocca

10

identified Cortez in video showing Cortez's confrontation with officers outside the North Doors. Larocca acknowledged that he knew that there were violent people in the crowd but claimed that he did not see any violence himself. Larocca voluntarily allowed the interviewing agents to search and image his cellular phone. He did not apologize for his conduct or express regrets about his participation in the riot.

*The Charges and Plea Agreement*

On March 15, 2021, the United States charged Larocca by criminal complaint with violating 18 U.S.C. § 1512(c)(2), 18 U.S.C. §§ 1752(a)(1), (2), and 40 U.S.C. §§ 5104(e)(2)(D), (E), and (G). On March 26, 2021, law enforcement officers arrested Larocca and Cortez at their home in Seabrook, Texas. On April 23, 2021, a grand jury in the District of Columbia returned an indictment charging Larocca on five counts: 18 U.S.C. §§ 1512(c)(2), 2, 18 U.S.C. §§ 1752(a)(1), (2) and 40 U.S.C. §§ 5104(e)(2)(D), (G). On April 8, 2022, pursuant to a plea agreement, Larocca pleaded guilty to Count 3 of the indictment, charging him with a violation of 18 U.S.C. § § 1752(a)(2). By the plea agreement, Larocca agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Larocca now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, Larocca faces up to one year of imprisonment and a fine of up to $100,000. (PSR ¶¶82, 92)  Larocca must also pay $500 in restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Cordon's adjusted offense level under the Sentencing Guidelines as follows:

Count Three: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| Adjustment for Acceptance of responsibility (U.S.S.G. §3E1.1) | | -2 |
| Total Adjusted Offense Level: | | 8 |

(*See* PSR at ¶¶35-41.)

The U.S. Probation Office calculated Larocca's criminal history as a category I.  (PSR at ¶44.)  Accordingly, the U.S. Probation Office calculated Larocca's total adjusted offense level, after acceptance, at 8, and his corresponding Guidelines imprisonment range at 0 to 6 months. (PSR at ¶78.)  Larocca's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful consideration to the Guidelines."  *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation

of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic

norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.   As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while assessing Larocca's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Larocca personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on Larocca's part is therefore not a mitigating factor in misdemeanor cases.

The nature and circumstances of Larocca's offense weigh towards a meaningful term of incarceration.  Larocca and Cortez joined the riot at its zenith—when rioters were pouring into the

building, scaling the walls of the Capitol, and, on the West Front, battling police in hand-to-hand combat.[9]  Larocca and Cortez saw the utter pandemonium and, rather than read the red flags and turn around, they snapped selfies and marched into the building.  Larocca and Cortez entered through the Parliamentarian Door at 2:53 p.m., which was not obstructed at the time, and they remained in the Capitol for 13 minutes, leaving after encountering heavy police presence and being told they would be arrested if they did not leave.

Larocca's disruptive conduct on inside and outside of the Capitol building was knowing and deliberate.  Larocca methodically recorded events on his cell phone from the time that he arrived on Capitol grounds, through the Capitol Building, and rioters' confrontation with police outside the North Doors.  This crowd of rioters (including Larocca and Cortez) obstructed officers' efforts to protect the Capitol and threatened the officers' physical safety.

Larocca posted his videos to his Instagram story, promoting the riot to his followers as it was happening.  His caption, "We got in," communicates the intention behind his breach of the Capitol, as well as his pride at having done so.  In videos, comments, and messages on Instagram, Larocca communicated before, during, and after his breach of the Capitol exactly what he was doing there: "Hell yea. It was a demonstration of how we can take it back."  Larocca's use of social media and public promotion of the riot is substantially aggravating.

As is the indifference with which he approached the riot and police efforts to disperse the crowd.  In the videos that he recorded, Larocca frequently flipped the camera around to "selfie"

---

[9]      The government has not been able to determine whether Larocca saw the physical assaults by other rioters on the police near the West Front of the Capitol.  But that violence was primarily taking place on the Lower West Terrace, near base of the Northwest Stairs.  Based on the approximate time that Larocca and Cortez ascended those stairs, it seems impossible that they would not have been at least peripherally aware of that raging battle.  Moreover, Larocca's presence on Capitol Grounds as part of a large mob doubtlessly distracted officers and undermined their ability to defend themselves.

mode to show his face.  In most of these videos, his face is chillingly calm, despite the chaos around him, despite rioters screaming at police, and—amazingly—in Exhibit 6 when he pans the camera downward to show himself covered in residue from tear gas or fire-extinguisher retardant. Larocca did not care that "me and Christian got 4 different kinds of mase sprayed on us … tear gassed etc." or "We kind of got fucked up … Lmaooo."  If his verbal and facial expressions on the day are any indication, he could not care less.  The nature and circumstances of the riot were extreme, and Larocca's attitude in the midst of it all was stunningly casual.  These factors are aggravating and weigh in favor of incarceration.

Larocca is entitled to some marginal credit for his cooperation with law enforcement after the riot—he voluntarily agreed to be interviewed by the FBI before his arrest and allowed them to search and image his cell phone before a warrant was obtained.  Larocca was shown videos of himself and Cortez, and Larocca identified himself and Cortez therein.  Further, while Larocca may have followed the directions of police to leave the Capitol building, before that, he stood in a crowd and chanted at police who were blocking passage through the Brumidi Corridors.  And he only left the builing after being threatened with arrest.  Any mitigation as a result of these factors is negligble and does not support a sentence below the government's recommendation.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Benjamin Larocca does not have a criminal history.  (PSR ¶44.) Larocca is 28 years old, has a bachelor's degree, and is employed full-time as a residential sales consultant with his mother and stepfather's real estate company.  He does not have dependents or a spouse.  Larocca has been compliant with his conditions of pre-trial release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[10]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be

---

[10]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Larocca's indifference toward his conduct on January 6, 2022, and the fact that he has yet to show meaningful contrition demonstrates the need for specific deterrence.  Larocca said he was just "chilling" at the Capitol, but the environment around him was definitely not "chill."  Anyone

who watches video from the riot—Larocca's and Cortez's own videos being good examples—can immediately see the chaos and the threat to police, not to mention the abstract but very real threat to democracy posed by rioters trying to "take it back."  Make no mistake, this was no ordinary day at the Capitol and Larocca was no tourist.

The government acknowledges and credits the fact that Larocca accepted responsibility early by voluntarily speaking with the FBI and entering into this plea agreement.  But Larocca's failure thus far to meaningfully acknowledge the role that he played in the danger and violence of January 6, 2021, demands specific deterrence through the imposition of an incarceration sentence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[11]  This Court must sentence Larocca based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.  Although those like Larocca convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not be the default.[12]  *See United States v. Anna*

---

[11]    Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[12]    Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track"

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing); *accord*, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Larocca has pleaded guilty to Count 3 of the Indictment, charging him with disruptive and disorderly conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2).  This offense is a Class A misdemeanor. 18 U.S.C. § 3559.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases to which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."  *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

---

program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the exact balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. In general, judges in this District have imposed significant terms of incarceration for Capitol Breach defendants who have pleaded guilty to 18 U.S.C. § 1752(a)(2).[13] Judge Jackson distinguished Section 1752 cases from 40 U.S.C. § 5104(e)(2)(G) cases in *United States v. Dennis Sidorski*, 21-cr-48 (ABJ): "There have been a fair number of January 6 defendants who received probation, but generally they're the ones charged with the six-month parading misdemeanor … I share the view of a number of the judges on this court ... that this is not a probation set of facts." Tr. 6/28/22 at 44, 46.

---

[13]    *United States v. Marquez,* 21-cr-136 (RC), is an outlier among 1752(a)(2) cases. In that case, the Court imposed a sentence of three months' home detention given Marquez's documented and extensive mental-health issues. The mitigating factors driving a non-carceral sentence in Marquez are not present here.

In *Sidorski*, Judge Jackson imposed a 100-day term of incarceration for conduct comparable to Larocca's.  Sidorski entered the Capitol directly behind the initial wave of rioters, documenting the events on his cell phone, and did not commit any direct acts of destruction. However, Sidorski grabbed a police officer's arm while that officer was trying to clear an area, which Judge Jackson considered aggravating.  Larocca did not appear to have come into direct contact with any police, though he did stand face-to-face with officers blocking the crowd's passage through the Brumidi Corridor, and he witnessed his friend Cortez leading an attack on police outside the North Doors.  A sentence of 90 days' incarceration would not create an unwarranted sentencing disparity between this case and *Sidorski*.

Phillip Bromley, 21-CR-00250 (PLF), berated U.S. Capitol Police officers guarding a door to the Capitol building, then watched as his cousin assaulted one of them.  After the officers were driven off, Bromley encouraged his cousin and tried to help him breach the unguarded doors. When the doors were opened later, Bromley went inside, where he witnessed the shooting of Ashli Babbitt.  Bromley spent even less time inside the Capitol building than Larocca—9 minutes as opposed to Larocca's 13.  Like Larocca, Bromley did not assault anyone or destroy any property. Judge Freedman sentenced Bromley to 90 days' incarceration.

Larocca stood by as his codefendant Cortez and others harassed and taunted U.S. Capitol Police officers, and stayed close as police sprayed Cortez and other rioters with chemical irritants in an attempt to disperse the mob.  Further, Larocca encountered police inside the building, as well, who were attempting to block rioters' passage through the halls of Congress.  Larocca filmed and posted videos himself to Instagram chanting and agitating police along with the crowd.  At multiple points, Larocca came face-to-face with police trying stop rioters from progressing through and back into the building.  Larocca knew he was not supposed to be on the grounds, he was not

supposed to be in the building.  He knew that police were trying to stop him and the rioters whom he was with.  These aggravating factors weigh in favor of incarceration, as they have in the cases cited above.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), this Court sentenced the defendant to 45 days of incarceration after the defendant pleaded guilty to a violation of 40 U.S.C. § 5104.  Like Larocca, who posted to Instagram video of himself chanting inside the Capitol and boasting about having made it inside, Mazzocco took photographs of himself smirking during the riot and was aware of the crowd outside the Capitol.  Larocca's obvious enthusiasm and pride at having broken into the Capitol is utterly disrespectful to the rule of law.  Larocca's triumphant attitude demands a sentence of incarceration as this Court imposed in Mazzocco.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Benjamin Larocca to three months' incarceration, one year of supervised release, 60 hours' community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    _____/s/_____
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
Troy A. Edwards
Assistant United States Attorney
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048